## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

SCOTT SHEFFIELD,

       *Plaintiff,*

   v.

UNITED STATES FEDERAL TRADE
COMMISSION,

AND

LINA KHAN, REBECCA KELLY SLAUGHTER
AND ALVARO BEDOYA, in their official
capacities as Commissioners of the
FEDERAL TRADE COMMISSION,

       *Defendants.*

No._____


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF


THE LAW OFFICE OF JASON NASH, P.L.L.C.
601 Jameson St.
Weatherford, TX 76086
Tel. (817) 757-7062


CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue NW
Washington, DC 20037
Tel. (202) 974-1500
Fax (202) 974-1999

MCKOOL SMITH P.C.
300 Crescent Court, Suite 1200
Dallas, TX 75201
Tel. (214) 978-4000
Fax (214) 978-4044


Dated: January 21, 2025

## INTRODUCTION

1.      After the close of business on the final business day of the last administration, the Federal Trade Commission ("FTC" or the "Commission") by a 3–2 vote issued an Order that prohibits ExxonMobil Corporation ("Exxon") from appointing Plaintiff Scott Sheffield to its Board of Directors, prohibits Exxon from appointing Mr. Sheffield to serve as an adviser "in any capacity" to Exxon's management, and prohibits Exxon from appointing thousands of other current or former employees of Pioneer Natural Resources Company ("Pioneer") to its Board. Mr. Sheffield brings this action to vacate that Order, which violates his constitutional and other legally protected rights, and to enjoin the commissioners of the FTC who concocted this attack on Mr. Sheffield from continuing to misuse their positions against him.

2.      Styled as a "Consent Order," but entered without Mr. Sheffield's consent or any meaningful opportunity for him to be heard, the Order purported to finalize the FTC's pre-merger review of Exxon's acquisition of Pioneer, of which Mr. Sheffield was previously a Board member and the CEO. As part of the proposed merger, Exxon was contractually obligated to take steps to seat Mr. Sheffield and another former Pioneer Board member or executive as members of its post-merger Board. The FTC's Order prohibits Exxon from fulfilling that obligation, and thus deprives Mr. Sheffield of the opportunity to serve on Exxon's Board or in any other advisory capacity. It also deprives Mr. Sheffield and other Pioneer shareholders of

the benefit of an important contractual obligation in the merger agreement that was approved by an independent Board of Directors and in a shareholder vote.

3.    Entered over the dissent of two FTC commissioners, including the incoming FTC Chairman, the Order and the complaint that supported it (the "Complaint") were described by the dissenting commissioners as "fabricated," "embarrassing," "indifferen[t] to First Amendment rights," "woefully inadequate," "lawless," a "fairy tale," and "one of the most ludicrous theories of harm in [the FTC's] merger-enforcement history." These dissenting commissioners are well versed on administrative and constitutional law, having each had distinguished careers as practitioners and in government service. Most recently, before taking their seats as FTC commissioners, dissenting Commissioner Ferguson served as Solicitor General of Virginia and dissenting Commissioner Holyoak served as Solicitor General of Utah.

4.    The FTC premises its Order on its Complaint that was filed publicly on May 2, 2024. That Complaint alleged that Mr. Sheffield "campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ('OPEC'), and a related cartel of other oil-producing countries known as OPEC+." But the FTC did not have the evidence to support these defamatory assertions, and by leveling them as part of a purported consent process, the three commissioners who voted for the Order apparently assumed that the FTC would never have to prove their accusations.

5.     The Complaint also alleged that Mr. Sheffield exercised his First Amendment rights in a manner that the three majority commissioners found objectionable: Mr. Sheffield made public statements about oil production, and supported a petition made by Pioneer to the Texas Railroad Commission ("TRRC") during the COVID-19 Pandemic to exercise its statutory authority to regulate oil production in Texas. But protected activities cannot be the basis for a law enforcement action. The FTC's claim otherwise is a frontal assault on Mr. Sheffield's constitutionally protected activities, which the FTC majority commissioners apparently believed would escape legal scrutiny if shrouded in the "Consent Order" process.

6.     Conspicuously absent from the FTC's Complaint was any allegation that Mr. Sheffield had himself violated the law. The Complaint alleged no instance in which he entered into, or attempted to enter into, any agreement in restraint of trade or any other unlawful conduct. Also absent was any viable theory that the combination of Exxon and Pioneer would violate antitrust laws. Pioneer was a comparatively small producer, and its acquisition by Exxon would not have meaningfully changed the market concentration in the global oil market. Nor did the FTC allege otherwise. That should have been the end of the matter.

7.     Instead, the premise of the FTC's Complaint was that "Mr. Sheffield's post-merger appointment to Exxon's Board would give him a larger platform from which to advocate for greater industry-wide coordination as well as decision-making input on not only the largest producer in the Permian Basin, but

also the largest multinational supermajor oil company." In other words, the three majority commissioners did not like what Mr. Sheffield had to say, or what he might "advocate" in the future as one member of a large board of directors. So they threatened Exxon with a sham lawsuit to coerce the company into agreeing to a "consent" order that deprived Mr. Sheffield of his right to take a position with the company.

8.      The incoming FTC Chairman has described the process that led to the Order in this case as a "pay-for-peace racket." To close on its acquisition of Pioneer, Exxon was required to submit to a pre-merger review process before the FTC. Exxon and Pioneer were parties to that process; Mr. Sheffield was not. Having found no viable legal theory to block the acquisition before the clock ran out on its review, the FTC approached Exxon with a deal it could not refuse: approval of its $64.5 billion transaction and relief from its contractual obligation to seek to seat Mr. Sheffield on its Board, all in exchange for giving the majority commissioners an excuse to malign Mr. Sheffield in a sham complaint and public statements that would never have to be defended before a neutral fact-finder. Then, having placed the Order on the public record and observed a short public comment period, the majority commissioners waited many months before finalizing it on the last day of the administration.

9.      The FTC's allegations against Mr. Sheffield only make sense if the Commission believed it would never have to defend them. As the dissenting commissioners observed, "the Majority does not rely on this Complaint in a litigated

case, nor would I ever ask staff to defend such allegations in court." In fact, despite being expressly targeted by name in both the FTC's Complaint and its accompanying press release, Mr. Sheffield was not apprised of the assertions the FTC planned to level against him until the last minute—long after he could defend against them:

- The FTC provided Exxon (his employer's counterparty) with a draft Complaint two days before Exxon consented to the Order and three days before preliminarily approving the Order and making it public in May 2024.

- When Mr. Sheffield promptly retained counsel, FTC staff refused to discuss the substance of the case with them and proceeded to publish the Complaint and preliminarily approved Order while his counsel were in transit for their very first meeting with Mr. Sheffield.

- The FTC did not provide Mr. Sheffield with the evidence on which its erroneous and injurious determination relied.

- The FTC did not provide Mr. Sheffield any opportunity to address the evidence it claimed "supported" its accusations.

- As part of its investigation, the FTC took Mr. Sheffield's sworn testimony on April 9, 2024, for hours, yet did not ask him about statements on which the FTC's Complaint was based. Rather than give Mr. Sheffield the opportunity to explain the statements, the FTC drew its own erroneous inferences about what those statements might mean and neither sought nor entertained any context.

- The FTC provided no mechanism for Mr. Sheffield to submit any written or oral argument to address the FTC's accusations before publishing its Complaint and proposed consent order.

- When Mr. Sheffield exercised his right as a member of the public to submit a written comment through the public comment process available to any interested person, the FTC immediately and summarily issued a statement to the media rejecting the substance of his comment—a mere five hours after his comment was submitted.

- The FTC did not consider Mr. Sheffield's submission. Its response letter, published with an unchanged final order just after 5:00 pm EST on the final working day of the prior administration, falsely

claimed that Mr. Sheffield had received due process and in any event was not a party to its Order—despite being personally named in the Complaint forty-seven times.

- Despite waiting an unusually long time following the close of the public comment period to issue the Final Decision and Order on the eve of the changing administration, the FTC did not use that time to conduct any further investigation into or scrutiny of its own allegations.

10.    The FTC's Final Decision and Order in *In re ExxonMobil Corporation*, Docket No. C-4815, is unlawful. It was entered by the FTC in violation of the procedural safeguards of the Administrative Procedure Act, the United States Constitution, and the FTC's own organic statute by bringing its enforcement action against an individual under the guise of a consent proceeding with a third party who has no incentive to resist. A government agency cannot side-step Mr. Sheffield's—or anyone's—statutory and constitutional rights by coercing the "consent" of a third party to enter an order that purports to carry the force of law. Mr. Sheffield's rights are not so easily brushed aside.

11.    Had Mr. Sheffield been afforded the legal protections that the law entitles any American citizen to receive before he is made the target of an agency's order, he would have been able to reveal the lack of substance behind the FTC's allegations. There is no evidence to support the allegation that Mr. Sheffield ever colluded with, or attempted to organize, a cartel of U.S. oil producers. The FTC based its allegations in large part on public statements that Mr. Sheffield made to the media and in conferences about his own view of how market forces would impact the industry in which he spent his entire career. There is nothing improper about the

CEO of a company commenting on, for example, what he believes investors are looking for from companies in his sector, or how he anticipates other market participants might act in the face of macro-market events. The FTC also based its allegations on private communications that the FTC misunderstood and that in fact reflected no improper conduct by Mr. Sheffield.

12.    The evidence upon which the FTC rests its allegations of attempted collusion with OPEC and OPEC+ demonstrates no attempt to collude with either of those bodies. For example, the FTC's accusations rest in part upon a text Mr. Sheffield sent his son about comments made in a virtual seminar organized by IHS Markit/CERA; WhatsApp messages sent to Mr. Sheffield and others blasting out publicly available articles and information; and communications between Mr. Sheffield and a U.S. analyst who follows the oil industry and OPEC. And Mr. Sheffield's support for Pioneer's very public petition to the TRRC, a government regulator, cannot be illegal conduct. To the contrary, it is protected First Amendment activity.

13.    Mr. Sheffield has been personally and concretely injured by the FTC's Order. Because of the FTC's Order, Exxon is prohibited from seating Mr. Sheffield or taking advantage of his decades of experience in the Permian Basin in any advisory capacity at all. The Order is substantively and procedurally unlawful, is a prior restraint of Mr. Sheffield's speech on matters of public concern, and violates his constitutional rights. It should be vacated.

## PARTIES

14.     Scott Sheffield is an individual who resides in Southlake, Texas, within the Northern District of Texas and within the Fort Worth Division thereof.

15.     The Federal Trade Commission is an agency of the United States federal government. *See* 15 U.S.C. § 41.

16.     Lina Khan is the former Chair and current Commissioner of the Federal Trade Commission.  She was sworn in as Chair of the Commission on June 15, 2021.  She is being sued in her official capacity.

17.     Rebeca Kelly Slaughter is a Commissioner of the FTC.  She was sworn in as a Commissioner on May 2, 2018.  She is being sued in her official capacity.

18.     Alvaro Bedoya is a Commissioner of the FTC.  He was sworn in as a Commissioner on May 16, 2022.  He is being sued in his official capacity.

## JURISDICTION AND VENUE

19.     This action arises under the Constitution, the federal courts' equitable powers, the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, the Clayton Act, 15 U.S.C. § 12–27, and the Federal Trade Commission Act, 15 U.S.C. § 41–58. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because the defendant is an agency of the United States and the Plaintiff, Mr. Sheffield, maintains his principal residence in Southlake, Texas.

## BACKGROUND

**A. Scott Sheffield Is The Longest Serving Public Independent Oil CEO In The Country And A Widely Respected Advocate For U.S. Oil Exploration And Production.**

21.     After graduating from the University of Texas at Austin in 1975, Mr. Sheffield began his career as a reservoir engineer for Amoco Corporation. He left Amoco after four years in 1979 to become one of the first employees of Pioneer's predecessor, a small Texas-based oil producer called Parker & Parsley Petroleum Company. He was promoted over the next decade and was eventually presented with the opportunity to purchase a significant stake in Parker & Parsley in the 1980s.

22.     Under his leadership, Parker & Parsley merged with another company in 1997 and went public as Pioneer Natural Resources Company. Mr. Sheffield served as Pioneer's CEO or Chairman for more than twenty-five years.

23.     Mr. Sheffield is among a small group of entrepreneurs most responsible for the shale revolution that now allows the U.S. to produce more oil than any other nation, ever. About fifteen years ago, Pioneer focused its attention on the Permian Basin, when other companies were more focused on overseas exploration and production. The company funded an extensive study of its hundreds of thousands of acres in Texas and found some of the largest oil fields in the world. Under Mr. Sheffield's leadership, Pioneer used leading-edge technology to extract that oil using horizontal fracking methods, which was then still relatively nascent and which had not yet been used at scale in the Permian Basin. Mr. Sheffield retired from his role as CEO of Pioneer at the end of 2016 but remained the company's Chairman.

24.     In early 2019, Pioneer's Board asked Mr. Sheffield to return as CEO. Mr. Sheffield returned to a rapidly changing landscape. By 2019, Pioneer shareholders were increasingly concerned about the prospect that global oil demand would peak in the medium to long term. Concerns about "peak oil" demand, combined with past practices of overspending cash flow and poor returns, led exploration and production companies like Pioneer to underperform other major industries in the S&P 500 from a shareholder perspective, even as oil prices increased.

25.     When Mr. Sheffield was reappointed as Pioneer's CEO, the Board recognized that Pioneer was struggling to react quickly enough to market changes. In 2017 and 2018, Pioneer overspent its capital budget. The Board reappointed Mr. Sheffield with a mandate to ensure Pioneer adhered to its annual budget and to reduce the company's cost structure.

26.     On his return to Pioneer, Mr. Sheffield refocused the company on development in the Permian Basin. Under his leadership, the company disposed of natural gas processing, oilfield services, and South Texas shale assets, raising capital that was used to make acquisitions and drive further development in the Permian Basin.

27.     In response to specific shareholder feedback and pursuant to the Board's mandate, and under Mr. Sheffield's leadership, Pioneer reduced its operating and capital costs and changed its capital framework in 2019 so that it would return free cash flow to shareholders in the form of share buybacks and dividends while still continuing to grow Pioneer's oil production. These measures are known as capital

discipline and are important differentiators in evaluating companies in capital markets. Mr. Sheffield's attention to shareholder concerns, his leadership of Pioneer as CEO, and his public statements about the company and the industry were all legitimate business activities and not, as the FTC asserts, attempts to organize some sort of collusion among producers.

28.    Pioneer performed well under Mr. Sheffield's leadership, operating efficiently, growing production, and providing a good return to shareholders and employees. He was highly regarded by the employees of Pioneer for the quality, fairness, and effectiveness of his leadership. In April 2023, Mr. Sheffield announced his intent to once again step down from the CEO role at Pioneer by the end of the year.

## B. When Pioneer Was Acquired By Exxon, A Condition Of The Transaction Was That Exxon Would Bring Mr. Sheffield Onto Its Board Of Directors.

29.    On October 10, 2023, Exxon and Pioneer entered into a Merger Agreement, whereby Exxon agreed to acquire Pioneer in a transaction valued at $64.5 billion. For Exxon, the transaction was a response to shareholder pressure to control capital expenditures on uncertain new field development and would give the company the largest high-return development potential in the Permian Basin. Analysts expected the transaction to lower Exxon's costs dramatically and rapidly boost its production.

30.    The transaction was also expected to re-focus Exxon on domestic oil production. After years of chasing overseas production, following its acquisition of Pioneer, around 45% of Exxon's oil production is expected to come from the U.S.

31.    The transaction was also favorable for Pioneer's shareholders, valuing Pioneer at $253 per share, which was nearly an 18% premium above its closing market value on the day the deal was announced.

32.    In addition to other terms, the Merger Agreement provided that Exxon would take necessary steps to secure a seat for Mr. Sheffield and one other former Pioneer designee on Exxon's Board of Directors. The reason for this provision was that the merger was structured as a stock swap, meaning that Pioneer shareholders would end up owning Exxon stock. Because Exxon's Board lacked expertise in upstream operations in the Permian Basin, Mr. Sheffield and his colleagues at Pioneer believed that having these Board seats would best protect their interests post-merger.

33.    Specifically, Section 8.12(a) of the Merger Agreement provided:

> Prior to the Closing Date, Parent shall take all necessary actions to cause Scott D. Sheffield and one director of the Company who is selected by the Company and reasonably acceptable to Parent (the "Company Designees") to be appointed to the board of directors of Parent (the "Parent Board") immediately following the Effective Time. The Company Designees shall meet the criteria for service on the Parent Board under Applicable Law and NYSE rules and the Corporate Governance Guidelines and any other criteria established by the Parent Board or the Nominating and Governance Committee of the Parent Board for such service that

-12-

are generally applicable to members of the Parent
Board (except that Scott D. Sheffield need not be an
independent director on the Parent Board).

34. This provision for Mr. Sheffield to be appointed to Exxon's Board
was part of the bargained-for consideration given by Exxon to Pioneer's former
shareholders, including Mr. Sheffield himself, in exchange for the acquisition of their
shares in the company.

35. That Mr. Sheffield would take a seat on Exxon's Board as a result
of the transaction was widely reported in the media as a feature of the transaction.
Mr. Sheffield would have brought decades of experience as CEO and Chairman of a
major U.S. oil producer to Exxon's Board.

## C. The FTC Found No Legal Basis To Block The Exxon Transaction Because There Was None.

36. More than six months elapsed between announcement of Exxon's
proposed acquisition of Pioneer in October 2023 and the deal closing on May 3, 2024.
During that time, the FTC reviewed the proposed transaction pursuant to the Hart-
Scott-Rodino Act. The FTC's staff and Exxon entered into an agreement that
governed the timing of the closing of the deal and afforded the FTC an opportunity to
conduct its pre-merger review even beyond the normal statutory waiting period
provided for under the Hart-Scott-Rodino Act. The FTC's investigation failed to
identify any aspect of the acquisition by Exxon of Pioneer that would violate the
federal antitrust laws, which is not surprising since the merging parties had a tiny
share of the global market for crude oil found by the FTC to be the relevant market
in this case. At the time of the transaction, Pioneer had a market share in the FTC's

defined market of less than one-half of one percent. As the two dissenting commissioners correctly observed when the FTC's Order was first published, "[t]he concentration in this market, and thus, the likelihood of successful coordination post-merger, are virtually unchanged by the proposed acquisition."

37. The FTC also considered whether Mr. Sheffield's appointment to Exxon's Board would violate Section 8 of the Clayton Act, which prohibits interlocking directorates between horizontal competitors. Mr. Sheffield is also a director of Williams Companies, Inc., a natural-gas processing and transportation company. But the parties provided information showing that Mr. Sheffield's simultaneous appointment to the Boards of Exxon and the Williams Companies, Inc. would not violate Section 8 of the Clayton Act, and the FTC did not allege otherwise.

38. In their dissent from the FTC's Final Decision and Order, the two dissenting commissioners explained in detail why the Exxon/Pioneer transaction could not be challenged by the FTC on any established theory of antitrust law:

> (1) Exxon and Pioneer's combined share in the alleged global market – and market concentration metrics generally – falls way below any level of centration that would be conducive to coordination; (2) the merger does not eliminate a maverick; (3) nothing in the Complaint suggests a postmerger change in incentives that would make the global market conducive to coordination; and (4) one of twelve board members will likely be less able to orchestrate coordination than could that same individual when he was a chief executive officer (and never coordinated the market).[1]

---

[1] Dissenting Statement of Commissioner Melissa Holyoak Joined by Commissioner Andrew N. Ferguson, *In the Matter of ExxonMobil/Pioneer Resources*, Comm. File No. 2410004, https://www.ftc.gov/system/files/ftc_gov/pdf/exxon-order-holyoak-dissenting-statement-01-17-2025.pdf.

39.    In reality, the FTC had no legal basis to object to Exxon's acquisition of Pioneer, a fact that was confirmed after an extensive investigation by the Commission's staff. And as a result, the FTC should have allowed the transaction to close without objection.

### D. The Majority Commissioners Mischaracterized The Record And Misled The Public To Smear Mr. Sheffield.

40.    On May 2, 2024, the FTC announced that it had provisionally agreed to a proposed Consent Order (the "Proposed Order") with Exxon. On the same day, it made a redacted version of the Complaint public. Although captioned as an administrative proceeding against Exxon, the Complaint in fact contained allegations exclusively about Mr. Sheffield's conduct—not that of Exxon or of Pioneer, or addressing in any respect any impact on competition that the combination of Exxon and Pioneer would have—naming and making accusations against Mr. Sheffield forty-seven separate times.

41.    Pursuant to the Proposed Order, Exxon agreed—as a condition of FTC approval of its acquisition of Pioneer—that it would be relieved of one aspect of the consideration it had given for that transaction and then some: Mr. Sheffield and other Pioneer employees or directors would not be permitted to serve on Exxon's Board. Nor would Mr. Sheffield be allowed to perform any advisory service for Exxon's Board or Exxon's management. Other than losing the services of a highly qualified potential director, this was all upside for Exxon because the Proposed Order

otherwise permitted Exxon to avoid the burden, expense and potential delay of a sham lawsuit by the FTC.

42.    Having found no basis to claim the proposed acquisition of Pioneer by Exxon violated the antitrust laws, the FTC focused its allegations on Mr. Sheffield's alleged personal conduct. Without evidence, the FTC asserted that Mr. Sheffield had engaged in prior acts of attempted coordination with industry competitors and with OPEC and OPEC+. While these allegations had nothing to do with Exxon or the business that Exxon could be expected to pursue in the future, the FTC asserted that by placing Mr. Sheffield on its Board, Exxon would "give him a larger and more powerful platform from which to advocate for greater industry-wide coordination as well as decision-making input on not only the largest producer in the Permian Basin, but also the largest multinational supermajor oil company."

43.    The FTC does not appear to have performed any meaningful investigation into how the Exxon Board functions or what impact Mr. Sheffield might have on the global crude oil market at issue if he were allowed to sit on the Board or advise the company about any topic. The majority commissioners, possibly without the support of the FTC's career staff, made this Board theory up so they could both attack Mr. Sheffield personally and demonstrate that they were taking action against the industry in connection with their review of the merger. The majority's sham assertion of a violation of Section 7 of the Clayton Act was that a single Board member moving from Pioneer to Exxon would substantially lessen competition in a global crude oil market where the companies have a tiny share of production and where Mr.

-16-

Sheffield would have no future operating responsibility. To state the theory is to demonstrate its lack of merit. It is inconceivable that this baseless legal theory could have survived scrutiny by a federal court.

44.    The FTC's allegations against Mr. Sheffield had nothing to do with Exxon, its business, or any anticipated business activities in which Exxon might engage. Even if he were appointed to Exxon's Board, Mr. Sheffield would have been one of many Board members, and the FTC identified no reason to believe that Exxon Board would begin engaging in such conduct in the future by virtue of Mr. Sheffield's addition to its ranks, much less that this would substantially lessen competition in the global market for crude oil. Nor did the FTC articulate how Mr. Sheffield becoming a Board member would substantially lessen competition as compared to the status quo *ex ante*, in which he was the sole CEO of Pioneer with far greater ability to act independently.

45.    Rather, all of the FTC's allegations had to do with Mr. Sheffield personally – and, in particular, with his views on the oil industry and oil production. The FTC's theory was that Mr. Sheffield had allegedly engaged in conduct the three majority commissioners find objectionable – though not itself unlawful – in the past, could be expected to do so in the future, and should be disqualified from holding employment in the future that might give him a "platform" to engage in similar conduct. The FTC's Complaint and Order were about punishing Mr. Sheffield and, apparently, furthering an agenda of the majority commissioners, not addressing any anti-competitive aspect of the transaction between Exxon and Pioneer.

46.    In addition to its allegations regarding purported prior attempted anticompetitive activity, the FTC alleged that Mr. Sheffield's service on the Exxon and Williams Boards would violate the more general prohibition of Section 5 of the FTC Act, 15 U.S.C. § 45, on "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices," because it would "facilitate a board interlock between competitors." Nothing in Section 5 of the FTC Act includes such a prohibition; rather, competitive issues arising from interlocking directorates are governed by Section 8 of the Clayton Act, which the FTC did not find would be violated here. Further, the FTC did not investigate the workings of these two boards or explain how Mr. Sheffield's service on both Boards would be an "unfair method of competition" under Section 5 of the FTC Act. It made no factual findings to support this claim. Moreover, requiring that Mr. Sheffield not sit on the Exxon Board for ten years is plainly an arbitrary and capricious remedy for such a violation even if it existed, as the violation would exist only so long as Mr. Sheffield also sat on the Williams Board. This claim was piled on at the last minute by the majority commissioners without a factual or legal basis, and is further evidence of the agency's unlawful conduct in this case.

47.    Beyond lawless, moreover, the FTC's substantive allegations against Mr. Sheffield were unsupported by evidence, as Mr. Sheffield would have readily shown had he been afforded any opportunity to do so. Indeed, the FTC has no administrative record to speak of besides its own reading of ambiguous documents to support the allegations in the Complaint.

-18-

48.    For example, the FTC's Complaint referred to public comments made by Mr. Sheffield regarding his observations of the market and how Pioneer—unilaterally and in its own interests—intended to respond to those market conditions, mischaracterizing them as "threat[s]" to "producer[s] who might deviate from a coordinated output reduction scheme."

49.    But there was no scheme, and there were no threats. The FTC based its allegations on Mr. Sheffield's public statement that "all the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies," which in turn was Mr. Sheffield's observation of well-documented investor sentiment that he believed was relevant to Pioneer's future strategy. Referring to "shareholders" "punishing" a company or industry is a commonly-used turn of phrase in business and finance to express one's expectations that the market would react negatively to a given event or practice. In other words, Mr. Sheffield was expressing his own view that Pioneer had made the right choice in shifting its capital framework and that other public companies in the Permian Basin were likely experiencing similar pressure and independently coming to the same conclusion as Pioneer.

50.    Likewise, the FTC pointed to public comments expressing Mr. Sheffield's expectation that publicly traded independent oil producers would be disciplined in their capital investment "even if oil gets to $200/bl." But that public comment too was nothing more than typical CEO commentary on market conditions and his expectations regarding how other market participants would react. Mr.

Sheffield did not threaten other producers—the FTC produced no evidence that Mr. Sheffield had the ability to do so or that other market participants were incentivized to follow his lead unless they independently determined that doing so served their own unilateral commercial interests.

51.    While the FTC alleged in conclusory manner that "[t]here is voluminous evidence, including from Mr. Sheffield's own public statements of his previous efforts to organize tacit (and potentially express) coordination of capital investment discipline and oil production levels in the Permian Basin, and across the United States," the only evidence that the FTC adduced was public commentary by Mr. Sheffield about market conditions. Those comments were made in a context where they obviously reflected an effort by Mr. Sheffield as the CEO of Pioneer to explain the strategy that his company was pursuing, why he believed it was the correct strategy, and therefore why he believed that other publicly traded market participants looking at the same market dynamics would ultimately come to the same conclusion. These were matters of legitimate public and shareholder interest, and Mr. Sheffield had a First Amendment right to discuss them publicly.

52.    The FTC also made incendiary allegations that Mr. Sheffield "is in close contact with top OPEC member state oil ministers and other high-ranking official representing the cartel" and "uses these relationships to encourage OPEC production controls and to discuss U.S. producers' efforts to maintain capital discipline in order to increase Pioneer's profits." Any suggestion that Mr. Sheffield was able to, or believed he was able to, exert influence over the production decisions

of OPEC member states is farcical. And the supposed evidence the FTC cobbled together was nothing of the sort.

53.    As just one example, the FTC's assertion of "private" communications between Mr. Sheffield and an official of the UAE in fact cites a single text message between Mr. Sheffield and his son on June 3, 2020, in which Mr. Sheffield noted that he "[j]ust got off the phone with the UAE oil minister. Opec plus is upset with Parsley and EOG public statements about bringing on production." But this was not a private one-on-one phone call. It was an IHS Markit/CERA-organized Zoom seminar that Mr. Sheffield attended along with other participants at the height of the COVID-19 Pandemic. Mr. Sheffield texted his son, who was CEO of Parsley at the time, simply to let him know that his company had been mentioned.

54.    Likewise, the FTC alleged that Mr. Sheffield had "regular contacts" with OPEC through which he learned the "machination of OPEC" and "gleaned insight to non-public information regarding the existence of internal OPEC deals." But the only two "contacts" that the FTC identified to support such an allegation were communications with a U.S. analyst who studied the industry and reported on OPEC activities—facts of obvious relevance to the CEO of a U.S. oil producer.

55.    The FTC's other examples sound unsavory in the FTC's telling, but, in fact, boil down to more of the same ordinary-course business communications. Nothing about them suggested any effort by Mr. Sheffield to collude or coordinate production with competitors. As the dissenting commissioners' observed, "[t]he

factual interpretations and context of the Complaint, as written, did not provide reason to believe that the law had been violated."

### E. The FTC's Order Overtly Targeted Mr. Sheffield's First Amendment Protected Activities.

56.    The FTC's Complaint and accompanying public statements make explicit that Mr. Sheffield was targeted based, at least in part, on his First Amendment protected activities. These include petitioning the TRRC in 2020 to exercise its statutory authority to limit production of oil to prevent waste and a desire by the FTC to deprive Mr. Sheffield a "larger platform" to advocate on matters of public concern.

57.    Notably, when challenged by Mr. Sheffield and the dissenting commissioners on using Mr. Sheffield's public statements as the basis for law enforcement action against him, the majority commissioners' only response—in a letter published with the Order—was "that Mr. Sheffield's speech and actions can support the Commission's complaint and proposed order and their inclusion in the complaint does not violate Mr. Sheffield's First Amendment rights." In other words, this is the unusual case in which a government agency admits both to having taken action against a private citizen based on his legal but apparently undesired speech, and asserts that there is nothing wrong with doing so.

58.    As supposed evidence of Mr. Sheffield's efforts to "organize tacit and potentially express coordination," the FTC alleged that, "[i]n 2020, Mr. Sheffield lobbied The Railroad Commission of Texas (RRC) to impose output restrictions on

Permian oil production at the outset of the COVID-19 pandemic. Mr. Sheffield was the leader of the movement advocating RRC mandated production cuts, which would have reduced output and increased crude oil prices above market levels."

59. By this allegation, the FTC made clear that one basis for issuing the Proposed Order was Pioneer's petition to a government agency to exercise its statutory authority on policy grounds. But Mr. Sheffield's participation in that effort was clearly protected under the First Amendment's guarantee of the right "to petition the Government for redress of grievances." The FTC's issuance of the Consent Order on the basis of such protected activity also violated the *Noerr-Pennington* doctrine, pursuant to which the Supreme Court has made clear that the antitrust laws must be interpreted in a way that respects the right of citizens to request government action.

60. By way of background, in 2020, Russia and Saudi Arabia started a price war after failing to reach a deal for Russia to cut production. The COVID-19 Pandemic exacerbated the effects of the price war by creating a once-in-a-lifetime demand shock resulting from an unprecedented closure of businesses around the world. Oil at one point reached negative 37 dollars a barrel with about 1.2 billion barrels of oil in excess of demand over the first half of 2020, which threatened to bankrupt hundreds of independent oil producers in the United States. In fact, over 100 companies in the sector did declare bankruptcy that year. At the same time, governments at all levels were taking extraordinary action to protect domestic industry from the unforeseeable effects of the pandemic. In order to protect the health

of the U.S. oil industry—a critical and strategic industry—Pioneer retained legal counsel in early 2020 to petition the TRRC to take unneeded barrels off the market to avoid harmful waste, a role (based on Texas statutes) that the TRRC has historically performed. Mr. Sheffield's hope in advancing the TRRC petition was that it would jumpstart a broader government solution among the United States, Russia, and OPEC and avoid the destruction of the domestic industry.

61.     The TRRC regulates oil and natural gas production in Texas. It is the oldest state regulatory agency in Texas, established over 130 years ago. The TRRC has authority to regulate and limit production for the prevention of waste. Waste is "production of oil in excess of . . . reasonable market demand." The TRRC is comprised of three commissioners, who serve for six-year, staggered terms, with one commissioner position up for election every two years. Texas law permits any person to request that the TRRC hold a hearing to determine whether "any rule or order should be adopted . . . to correct, prevent, or lessen the waste." The TRRC is obligated to "make and enforce rules" to prevent waste "[w]hen necessary."

62.     On March 30, 2020, Pioneer and Parsley filed a motion with the TRRC requesting a market-demand hearing and market-demand order. Invoking the TRRC's statutory authority, the motion requested that the TRRC "conduct a hearing," which would have been public, "to determine whether the waste of oil and gas" was taking place in Texas and, if so, adopt a rule to "correct, prevent, or lessen the waste." The motion also requested that the TRRC "inquire as to the reasonable market demand for oil" and "issue any rule or order, effective for May 2020 production," as

may be appropriate. The motion noted that global conditions and limited supply resources meant Texas oil producers might be "forced to abandon current and planned production" and "may not survive," which would threaten the United States' energy independence. Pioneer was concerned that during such a chaotic time, producers would shut down production in "an ad hoc and haphazard manner that [would] heighten industry disruption and cause economic waste." Pioneer therefore called on the TRRC "to bring fairness and uniformity to any curtailment of production."

63.    The TRRC evaluated Pioneer's motion and ultimately denied it (2-1), with one of the three appointed commissioners supporting the motion. Pioneer and Parsley had a right to appeal the denial but opted not to do so, because in the interim, the highest levels of the United States Government brokered a deal for OPEC+, the United States, Canada, Brazil, and Norway to cut oil production by about 9.7 million barrels of oil per day. There is no doubt that Pioneer's motion to the TRRC brought necessary attention to a perilous threat facing the U.S. oil and gas industry at the depths of the pandemic.

64.    Mr. Sheffield's support of Pioneer's petition to the TRRC was protected activity that cannot lawfully have provided the basis for the FTC's Consent Order.

65.    More generally, in this case, the FTC adopted the unprecedented position that Mr. Sheffield's anticipated future speech—that is, positions he might take or advocate as one member of the Board of a publicly-traded company was unlawful and could be targeted and constrained. In the absence of any findings that

-25-

the combination of Pioneer and Exxon would have actual anti-competitive effects as an economic matter, the majority commissioners focused instead on what Mr. Sheffield might do or say in the future, and how—in their view—his positions might be amplified by taking a role on Exxon's Board. The majority commissioners made clear in their published complaint and their analysis of the proposed order that a basis for issuing the Order was the FTC's view that "Mr. Sheffield's post-merger appointment to Exxon's Board would give him a larger platform from which to advocate for greater industry-wide coordination."

66.    Setting aside the FTC's characterization of Mr. Sheffield's prior communications, the FTC's Order is revealed by the agency's own statements as a prior restraint of Mr. Sheffield's speech. Mr. Sheffield's right to "advocate" for his views of how the market should function is First Amendment protected activity that the FTC specifically targeted and restrained.

## F. The FTC's Order Against Mr. Sheffield Was Issued With A Lack Of Due Process.

67.    The FTC characterized the process that led to the issuance of the Order as a proceeding on a "Consent Order" pursuant to "Part 2" of its Non-Adjudicative Procedure Rules, 16 C.F.R. § 2.31, *et seq*. Because the only parties to that proceeding were the FTC and Exxon, Mr. Sheffield was deprived of any

substantive opportunity to be heard, to challenge the allegations against him, or to require the FTC to prove that its allegations were true.

68.    As a result, notwithstanding the FTC's Complaint, the Proposed Order, and the majority commissioners' public statements about them focusing on Mr. Sheffield personally—and not on Exxon or any aspect of its acquisition of Pioneer—Mr. Sheffield was afforded no due process whatsoever. To the contrary, the FTC went out of its way to ensure that Mr. Sheffield was not afforded a reasonable opportunity to answer the allegations against him.

69.    As is typical for executives of companies undergoing merger reviews, Mr. Sheffield was questioned under oath by the FTC staff. That occurred on April 9, 2024, and took four hours. Despite being invited by counsel for Pioneer to ask Mr. Sheffield about documents and statements that might be of interest, the FTC did not ask Mr. Sheffield about the statements that were later featured in the Complaint. The result was that the documents on which the FTC's Complaint was based were considered by the FTC commissioners devoid of any context or explanation from Mr. Sheffield. As a result, the FTC avoided having to respond to or address Mr. Sheffield's explanations of those communications.

70.    The FTC also rushed the process of approving the Proposed Order such that Mr. Sheffield had no meaningful opportunity to provide information to the FTC before it voted to approve the Consent Order.

71.    In the closing days of the FTC's merger review, after learning that the FTC might be considering asking Mr. Sheffield not to take a seat on Exxon's

Board, Mr. Sheffield retained his own counsel around April 18, 2024. Counsel promptly reached out to the Commission's staff to understand the state of play. At counsel's request, a thirty-minute video conference was scheduled for April 24, 2024. The FTC's Director of the Bureau of Competition was invited to the call but did not join it. A Deputy Director who had been hired by the FTC less than three months earlier and who had minimal involvement in the merger investigation was the sole participant in the call. No members of the investigative staff joined.

72.     During that April 24 call, the Deputy Director declined to discuss any specific evidence that might be relied on by the FTC if it were to take action. He vaguely asserted that he believed the evidence supported a suggestion that Mr. Sheffield had "invited" some form of collusion, though he did not describe the scope or the timeframe or any specific evidence in making this conclusory assertion. Neither he nor any other employee of the FTC offered Mr. Sheffield an opportunity to respond to any allegations or explain any evidence before the majority commissioners made their decision. This call on April 24 was the only opportunity Mr. Sheffield's counsel was afforded to speak with anyone at the FTC before the majority commissioners announced their action on May 2, 2024. In finalizing the Order at issue here, the majority commissioners claimed that this thirty-minute conversation, held before Mr. Sheffield's counsel had an opportunity to review the evidence that the FTC planned to use against him or review it with Mr. Sheffield, satisfied the agency's obligation to afford Mr. Sheffield due process.

73.    From that point forward, all of the information Mr. Sheffield received was second-hand from Exxon, which was shared with the Pioneer Board. The FTC first shared a draft of its Complaint with Exxon on April 29, 2024, and Exxon signed the Consent Order two days later, on May 1, 2024. The Commission voted to approve it the very next day. The entire time between when Exxon received the FTC's allegations and when the FTC itself voted to approve them was a mere three days. The FTC never provided Mr. Sheffield with a copy of the Proposed Order or the Complaint, and never invited or allowed Mr. Sheffield to provide any information relevant to either.

74.    In contrast to the accelerated process here, the FTC's own guidance explains that "it typically takes four weeks to review a consent package after staff and the parties formally submit the settlement package to the Director of the Bureau of Competition. The Director of the Bureau of Competition then will take two weeks to review the consent package. Once the Director agrees that the proposed settlement addresses the competitive risk raised by the merger, the Director will make a recommendation to the Commission that the Commission accept the proposed consent order for public comment. The Bureau of Economics will separately make its own recommendation. The Commission will typically take two weeks to review the Bureau Directors' recommendations before voting on whether to accept the consent." *See It takes less time to do a thing right*, https://t.ly/-UiTv (Sept. 4, 2018).

75.    Not only did the FTC not afford Mr. Sheffield any meaningful due process before voting to approve the Proposed Order, it reflexively dismissed out of

hand his comments submitted during the thirty-day comment period—an opportunity afforded even to disinterested members of the public.

76.    On May 28, 2024, through counsel, Mr. Sheffield submitted a detailed 23-page, single-spaced public comment that methodically addressed the inaccurate allegations contained in the FTC's Complaint. The comment explained why the FTC actions had harmed Mr. Sheffield and deprived him of his rights without due process and without a legal basis. This comment was submitted as part of the public notice-and-comment period provided for under the FTC's rules, which provides for "the receipt of comments or views from any interested person." 16 C.F.R. § 2.34(c).

77.    Mr. Sheffield's comment was submitted to the FTC at 9:30 a.m. ET on May 28, 2024. By 2:20 p.m. the very same day—less than 5 hours later—the FTC had released a public statement substantively rejecting the substance of Mr. Sheffield's comment. The FTC's spokesperson told the FINANCIAL TIMES, for example, that: "The FTC stands by our allegations. . . . There is no question that Mr Sheffield publicly urged Texas oil producers to limit production, all while having regular private back-and-forth communications with senior OPEC representatives over a period of years."[2]

78.    It is inconceivable that the five FTC commissioners reviewed Mr. Sheffield's 23-page, single-spaced comment, conferred to deliberate, and rejected the

---

[2] "Ex-Pioneer CEO says he was 'scapegoated' in Opec collusion case", THE FINANCIAL TIMES https://www.ft.com/content/78bfb9e4-86bd-46d6-91e9-f4d43c2da2a6 (accessed May 28, 2024, 2:20 pm).

substance of his comment within this five-hour period. Certainly no effort was made to look into the points made by Mr. Sheffield or to investigate the context his comment provided regarding the communications cited in the Complaint. The only reasonable conclusion that can be drawn is that the leadership of the FTC had decided it would not take Mr. Sheffield's submission seriously regardless of what it said. And it did not do so.

79.    After publicizing its allegations and Proposed Order in May 2024, and after the thirty-day public comment period closed, the FTC did not bring up the Proposed Order for prompt consideration. Instead, the Commission waited a further *seven months*, until the very last business day (and, indeed, the very last working hours) before the change in administration. During that time, the FTC staff did not contact Mr. Sheffield or, to his knowledge, take any other actions to further investigate either the allegations of the Complaint or Exxon's acquisition of Pioneer.

80.    After 5:00 pm EST on January 17, 2025, the FTC finalized its Decision and Order and published it on the Commission's website. Two commissioners, including the incoming FTC Chairman, dissented strongly from the Order as discussed above.

81.    As is customary, the FTC's Order was accompanied by a written response to Mr. Sheffield's May 2024 comment.[3] That response, also issued over two dissents, purported to have "considered" Mr. Sheffield's comment and nonetheless

---

[3] FTC Letter to David I. Gelfand *et al.*, https://www.ftc.gov/system/files/ftc_gov-/pdf/2410004c4815exxonpioneerletterscommenters.pdf.

"conclud[ed] that the public interest is best served by issuing the proposed order in final form without modification." In fact, the three majority commissioners made clear that they had given meaningful consideration to neither Mr. Sheffield's procedural objections, nor the substance of his response, nor the strongly worded concerns of their colleagues.

82.    The FTC's response began by defending the FTC's action on the basis that Mr. Sheffield was not entitled to any due process whatsoever, and therefore could not have been deprived of any process. As the FTC asserted, "Mr. Sheffield is not a party to the proposed order, and the proposed order does not deprive Mr. Sheffield of anything to which he was entitled." According to the FTC, because "Mr. Sheffield is not a party to the merger agreement," ordering Exxon not to honor that agreement occasioned no injury to Mr. Sheffield.

83.    But the FTC's position is undermined by its own official press release. On May 2, 2024, the Commission's public statement accompanying its publication of the Proposed Order was entitled "FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal," and went on to proclaim that its Order "prevents founder and former Pioneer CEO Scott Sheffield from gaining a seat on Exxon's Board of directors or serving in an advisory capacity at Exxon once it acquires Pioneer" and that "Mr. Sheffield's past conduct makes it crystal clear that he should be nowhere near Exxon's boardroom. American consumers shouldn't pay unfair prices at the pump simply to pad a corporate executive's pocketbook."

84.    The dissent called out the Commission's duplicity:

> The Majority elevates form over substance. Mr. Sheffield's name appears 47 times in an eight-page redacted Complaint. The Majority repeatedly maligned him as the central figure in a cartel, and then performed a victory dance on his metaphorical grave in its press release…. The central—and almost sole—purpose of the Consent was to make sure Mr. Sheffield would never serve on Exxon's board

85.    The FTC then proceeded to recount a disturbing version of what it apparently considered to be grounds on which Mr. Sheffield *had* been afforded due process. The FTC's version of events on its face was non-compliant with the FTC Act and the Administrative Procedure Act but was also highly misleading:

- The FTC contended that it "undertook a substantial investigation" and that "Mr. Sheffield was involved in that process." But Mr. Sheffield was not a party to the process, was not apprised until the last minute that it might result in an order targeting him personally, and as discussed above the Commission's staff affirmatively chose not to ask him about the communications it later chose to make the centerpiece of its complaint.

- The FTC asserted that "Commission officials held a videoconference with Mr. Sheffield's counsel to discuss the facts and proceedings before Exxon entered the proposed order." But that is false. As discussed above, while Mr. Sheffield's counsel sought such a discussion, the one FTC employee to attend the call declined to discuss any specific evidence and then the Commission rushed to publish the Complaint and Proposed Order before Mr. Sheffield could even meet with his counsel.

- The FTC asserted that "Mr. Sheffield also received a copy of the draft complaint and proposed order prior to the Commission's vote to issue them for public comment" that "Mr. Sheffield … therefore had notice and opportunity to respond … before the Commission issued the complaint and proposed order for public comment" and that "Mr. Sheffield did not avail himself of the opportunity to respond to those allegations."

-33-

86.     This final assertion is extremely misleading. The FTC never provided Mr. Sheffield with the Complaint and Proposed Order—he obtained it second hand from Exxon through his seat on the Pioneer Board. And he did so only *three days* before the FTC's unannounced vote. Mr. Sheffield was not provided any "opportunity to respond" to the FTC's allegations. As the FTC itself asserts only two paragraphs before in the very same document, Mr. Sheffield was not a party to the Proposed Order and the FTC took the view he had no such right of response. And for its part, when three of the FTC's commissioners voted to release the Complaint and Proposed Order to the public they did not knew—nor apparently cared—whether Mr. Sheffield had received a copy of either.

87.     In any event, obtaining a draft FTC Complaint second hand two days before it was voted on, without warning in an unannounced vote, cannot in any universe be described as an "opportunity to respond" or any sort of due process.

88.     As for getting an advance copy of the Order, neither Pioneer nor Mr. Sheffield were willing to sign the Order because it was unfair to Pioneer and its shareholders, and it was unfair to Mr. Sheffield. The violation of due process at issue here is not an inability to negotiate the terms of a consent order he never signed. It is the deprivation of any ability to defend himself against the flawed allegations on which the Order was based.

89.     To make matters worse, the FTC's response to Mr. Sheffield's comment not only mischaracterized the negotiating history, it publicly and improperly revealed—and mischaracterized—what should have been confidential

settlement discussions between Exxon and the FTC. Specifically, the FTC revealed in its publicly filed letter that "counsel for the parties informed the Bureau of Competition that Mr. Sheffield was willing to irrevocably withdraw his candidacy as a member of Exxon's board to complete the transaction." Settlement negotiations between government agencies and parties under investigation are generally made with the expectation of confidentiality. In fact, while Mr. Sheffield had considered voluntarily relinquishing his expectation of a seat on Exxon's Board to appease the FTC and obtain approval of the transaction, he would have done so only as part of an informal amendment to the deal terms voluntarily agreed between the parties. Such a resolution would not have involved false allegations in a complaint and entry of an order, much less one that prohibits Mr. Sheffield from taking any advisory position with Exxon and that prevents thousands of former Pioneer employees from aspiring to be Exxon Board members themselves.

90.    The majority commissioners also fail to mention that they rejected the settlement proposal immediately and that the offer was promptly withdrawn. The gratuitous disclosure of confidential settlement discussions is not only unfair to Mr. Sheffield, it shows the lengths to which the FTC majority commissioners will go to defend their unlawful conduct.

91.    In proceeding as it did, the FTC ignored the procedural safeguards established by the FTC Act, the Clayton Act, the Administrative Procedure Act, and the FTC's own rules, as outlined below. *See infra* at ¶¶ 101–143.

92.     Notably, in her concurring statement supporting adoption of the Order, FTC Commissioner Rebecca Kelly Slaughter candidly acknowledged that among the reasons that the FTC did not follow its procedures to conduct a proper investigation and proceeding against Mr. Sheffield was the time that it would take to follow the procedures necessary to protect Mr. Sheffield's due process rights. As she observed, "[c]onduct investigations—rightly—are not subject to the strict statutory deadlines of merger investigations, and for a variety of reasons tend to take much longer."

93.     The dissenting commissioners warned that by pursuing, in substance, a proceeding against Mr. Sheffield wrongly dressed up as a consent order proceeding against Exxon the FTC was proceeding unlawfully: "We fear that the Commission is leveraging its merger enforcement authority to extract a consent from Exxon rather than addressing the conduct of one misbehaving executive," they wrote. Speaking at a July 10, 2024 conference, Commissioner Holyoak later confirmed, in even starker terms, just how lawless the FTC's action was:

> We knew the transaction would not substantially lessen competition. And it was really troubling because they used that merger enforcement as leverage to get Exxon to agree to this, to not allow Mr. Sheffield to be elevated to the board. This is a really perversion of our enforcement authority. This cannot happen. Agencies cannot be doing this. They cannot be using separate authority to extract something else that they could never have gotten in court.

https://t.ly/26eDq.

94.     Undeterred even by warnings from within, the FTC proceeded to finalize and issue the Final Decision and Order on January 17, 2025.

## G. The FTC's Order Was Intended To, And Did, Cause Mr. Sheffield Direct And Concrete Injury.

95.     The Order was intended to, and did, cause Mr. Sheffield direct, concrete, and particularized injuries. Moreover, Mr. Sheffield's injuries are irreparable in nature.

96.     All else aside, the Order concretely harms Mr. Sheffield by virtue of the damage done to his personal and professional reputation. Being accused in a public forum, in allegations that were widely reported and republished, of attempting to collude with OPEC and of attempting collude to inflate the price of oil caused an obvious injury to Mr. Sheffield's reputation. The majority commissioners or someone acting under their direction exacerbated the injury to Mr. Sheffield's reputation by improperly leaking to the press that it planned to make a wholly unjustified criminal referral of Mr. Sheffield to the Justice Department (a referral that, to Mr. Sheffield's knowledge, has resulted in no criminal investigation). This improper leak has resulted in calls by Congress for an Inspector General investigation at the FTC.[4]

---

[4] Letter from U.S. Representatives Pfluger, Griffith, and Duncan to FTC Inspector General (Nov. 19, 2024), https://www.scribd.com/document/796723531/Sheffield-Leak-Letter-FTC. *See* Report of the FTC Inspector General (Sept. 30, 2024), https://oig.ftc.gov/sites/default/files/reports/2024-11/2024-09-30the-FY-2024-TMC.pdf (stating "Although it is possible that some of the leaks could have originated from outside sources, it appears that the media may be obtaining significant amounts of [non-public information] from sources within the FTC.").

97.    But Mr. Sheffield's injury is not just reputational. The immediate effect of the Order is to prevent Exxon from seating Mr. Sheffield on its Board or playing any other advisory role for a company in which he became a shareholder as a result of the merger. But for the Order, Exxon was contractually obligated to take action to place Mr. Sheffield and another former Pioneer executive on its Board. That condition was bargained for, and it was part of the valuable consideration of the merger transaction.

98.    Exxon's contractual obligation to take action to place Mr. Sheffield on its Board is confirmed by Commissioner Bedoya's statement in connection with the Proposed Order. Responding to a challenge that the Merger Agreement did not actually entitle Mr. Sheffield to a Board seat, Commissioner Bedoya confirmed that the object of the Order was to deprive Mr. Sheffield of the expected opportunity to serve on Exxon's Board:

> Our colleagues raise a finger to contend that "the merger does not place Mr. Sheffield on the board." I fail to see how a written and executed "AGREEMENT AND PLAN OF MERGER" between the companies that stipulates that Exxon "shall take all necessary actions to cause Scott D. Sheffield . . . to be appointed to [its] board of directors . . . immediately following the Effective Time" of the merger somehow does not place Mr. Sheffield on that board as a result of the merger.

99.    For Mr. Sheffield, the opportunity to serve on Exxon's Board of Directors brought with it, in addition to the right to a director's compensation, the personal professional opportunity to participate in the management of a major oil company. It also provided him, as a shareholder of Exxon after the acquisition of

Pioneer, with the ability to protect not only his investment but also the investments of all Pioneer shareholders (being merged) through his participation on the resulting Board. Mr. Sheffield was otherwise exceptionally qualified for the role, and it was fully expected by both him and Exxon that he would take a board seat following Exxon's acquisition of Pioneer. The only obstacle to him doing so was the FTC's sham Complaint and coerced Order.

100.    The injury to Mr. Sheffield is also not a one-time event. Under the Order, the prohibition on appointing Mr. Sheffield to Exxon's Board remains in place for ten years, meaning that for the next decade he remains subject to an order from the FTC that effectively deprives him of rights and opportunities that would otherwise be available to him—including the right to act to protect an investment in Exxon that he still holds.

## GROUNDS FOR RELIEF

### COUNT ONE

### (Agency Action Without Observance of Procedure Required By Law, 5 U.S.C. § 706(2)(D))

101.    Mr. Sheffield incorporates by reference all of the foregoing allegations.

102.    Mr. Sheffield is a person suffering legal wrong because of agency action, specifically, the FTC's issuance of the Order and the specific injuries described above. Accordingly, Mr. Sheffield is "entitled to judicial review thereof." *See* 5 U.S.C. § 702.

-39-

103.    The Order is final agency action because it marks the consummation of the FTC's decision-making process, is neither tentative nor interlocutory, and is the action from which legal consequences will flow. *See* 5 U.S.C. § 704.

104.    The Order should be held unlawful and set aside because it was entered without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(D).

105.    The FTC Act specifies the procedure by which the FTC may issue an order requiring any person to cease and desist from violations thereof. 15 U.S.C. § 45(b). It provides, in relevant part, that:

> Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. . . . The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this subchapter, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person,

> partnership, or corporation to cease and desist from using
> such method of competition or such act or practice.

106.    The FTC did not follow the procedure under 15 U.S.C. § 45(b) prior to issuing the Order finding that Mr. Sheffield's future conduct would violate the FTC Act because, among other failings and as outlined in greater detail above, (a) it did not serve any complaint on Mr. Sheffield, (b) it did not fix any time for a hearing or conduct any hearing, (c) it afforded Mr. Sheffield no opportunity to be heard at any such hearing as to why an order should not issue, (d) it did not reduce any testimony on which it relied to writing and file it with the office of the Commission, and (e) it did not report in writing its findings as to the facts upon which the Order should be issued. Insofar as the Order was issued pursuant to the Commission's authority under the FTC Act, it was issued unlawfully.

107.    The Clayton Act specifies the procedure by which the FTC may issue an order to remedy violations thereof, including Section 7. 15 U.S.C. § 21(b). It provides, in relevant part, that:

> Whenever the Commission, Board, or Secretary vested
> with jurisdiction thereof shall have reason to believe that
> any person is violating or has violated any of the provisions
> of sections 13, 14, 18, and 19 of this title, it shall issue and
> serve upon such person and the Attorney General a
> complaint stating its charges in that respect, and
> containing a notice of a hearing upon a day and at a place
> therein fixed at least thirty days after the service of said
> complaint. The person so complained of shall have the right
> to appear at the place and time so fixed and show cause
> why an order should not be entered by the Commission,
> Board, or Secretary requiring such person to cease and
> desist from the violation of the law so charged in said
> complaint.... The testimony in any such proceeding shall

be reduced to writing and filed in the office of the Commission, Board, or Secretary. If upon such hearing the Commission, Board, or Secretary, as the case may be, shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall make a report in writing, in which it shall state its findings as to the facts, and shall issue and cause to be served on such person an order requiring such person to cease and desist from such violations, and divest itself of the stock, or other share capital, or assets, held or rid itself of the directors chosen contrary to the provisions of sections 18 and 19 of this title, if any there be, in the manner and within the time fixed by said order.

108.    The FTC did not follow the procedure under 15 U.S.C. § 21(b) prior to issuing the Order finding that Mr. Sheffield's future conduct would violate the Clayton Act because, among other failings and as outlined in greater detail above, (a) it did not serve any complaint on Mr. Sheffield or the Attorney General, (b) it did not fix any time for a hearing or conduct any hearing, (c) it afforded Mr. Sheffield no opportunity to be heard at any such hearing as to why an order should not issue, (d) it did not reduce any testimony on which it relied to writing and file it with the office of the Commission, and (e) it did not report in writing its findings as to the facts upon which the Order should be issued. Insofar as the Order was issued pursuant to the Commission's authority under the Clayton Act, it was issued unlawfully.

109.    The Administrative Procedure Act ("APA") provides for agency action by either rule making (5 U.S.C. § 553) or adjudication (5 U.S.C. § 554).

110.    The FTC has not asserted that the Order consummates a rule making process, nor did it follow the procedures for rulemaking under the APA.

-42-

111.    Under the APA, "adjudication" is the process by which an agency formulates an order. 5 U.S.C. § 551(7). Adjudicative proceedings under the APA require that the agency provide notice of the time, place, and nature of the hearing, the legal authority under which the hearing is to be held, and the matters of fact and law asserted.

112.    The APA requires that "all interested parties" be afforded an opportunity for "the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit." And, "to the extent that the parties are unable so to determine a controversy by consent" it requires "hearing and decision on notice and in accordance with section 556 and 557" of Title 5. *See* 5 U.S.C. § 554.

113.    Mr. Sheffield was plainly an "interested party" to an Order that accused him personally of violating the law and foreclosed him specifically from future professional opportunities. The FTC did not follow the procedure under 5 U.S.C. § 544 prior to issuing the Order, because it (a) did not hold any hearing at all, (b) did not provide Mr. Sheffield with notice of the facts and law asserted, and (c) did not provide Mr. Sheffield with the due process required under 5 U.S.C. § 556, including the opportunity to call and examine or cross-examine witnesses, submit documentary evidence, submit rebuttal evidence, or otherwise engage in such process "as may be required for a full and true disclosure of the facts."

114.    In issuing the Order, the FTC purported to follow its own "Consent Order Procedure," which is codified at 16 C.F.R. §§ 2.31–2.34. The FTC

based the promulgation of its Consent Order Procedure on a provision of the FTC Act entitled "Additional powers of the Commission," 15 U.S.C. § 46. *See, e.g.*, Rules of Practice Amendments, 64 Fed. Reg. 46267-02 (1999). No provision of 15 U.S.C. § 46 authorizes the FTC to promulgate procedures for the non-consensual adjudicating of the rights of citizens that differ from the procedures set out in 15 U.S.C. § 45(b) or 15 U.S.C. § 21(b).

115.    No other statutory provision authorized the FTC to issue the Order, which was accordingly unlawful. Because the process used by the FTC to issue the Order was unlawful, it should be vacated.

## COUNT TWO

### (Agency Action Contrary To Constitutional Right, Power, Privilege or Immunity, 5 U.S.C. § 706(2)(B))

116.    Mr. Sheffield incorporates by reference all of the foregoing allegations.

117.    Mr. Sheffield is a person suffering legal wrong because of agency action, specifically, the FTC's issuance of the Order and the specific injuries described above. Accordingly, Mr. Sheffield is "entitled to judicial review thereof." *See* 5 U.S.C. § 702.

118.    The Order is final agency action because it marks the consummation of the FTC's decision-making process, is neither tentative nor interlocutory, and is the action from which legal consequences will flow. *See* 5 U.S.C. § 704.

-44-

119.    The Order should be held unlawful and set aside because it was entered contrary to constitutional right, power, privilege, or immunity. *See* 5 U.S.C. § 706(2)(B).

120.    Like all Americans, Mr. Sheffield enjoys a constitutional right to petition his government for a redress of grievances. *See* U.S. Const., Amend I.

121.    Mr. Sheffield also has a constitutional right to speak publicly on matters that concern him, including but not limited to matters of public concern relating to the industry in which he made his career. *See* U.S. Const., Amend I.

122.    The TRRC is an agency of the State of Texas that is authorized by statute to issue an order limiting production of oil to prevent "waste," including "production of oil in excess of . . . reasonable market demand." 3 Tex. Nat. Res. Code §§ 85.045, 85.046. Under Texas law, "any person interested in the subject matter that waste of oil or gas is taking place in this state" is entitled to file a verified complaint seeking a hearing before the TRRC. 3 Tex. Nat. Res. Code § 85.049(a).

123.    The filing of such a complaint, as well as the advocacy for or against a complaint filed by another, are activities protected under the First Amendment's free speech and petitioning clauses. As outlined above, Mr. Sheffield's advocacy of Pioneer's complaint to the TRRC was accordingly the exercise of a right or privilege protected by the Constitution.

124.    As described above, the FTC expressly identified Mr. Sheffield's First Amendment-protected activities as among the grounds in its Complaint and that supported issuance of the Order. The FTC accordingly adopted the Order to

punish and/or retaliate against Mr. Sheffield for the exercise of a constitutionally protected right.

125. More generally, as discussed in greater detail above, the FTC admits that a principal purpose of the Order is to prevent Mr. Sheffield from obtaining a "larger platform" to "advocate" for his views regarding, among other things, the structure and conduct of companies in the oil industry. The Order is therefore expressly a prior restraint of speech, it is presumably constitutionally invalid, and the FTC has not and cannot carry the heavy burden of establishing a lawful justification for it.

126. Because the Order was issued in violation of Mr. Sheffield's constitutional rights, it is unlawful and should be vacated.

### COUNT THREE

### (Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not In Accordance With Law, 5 U.S.C. § 706(2)(A))

127. Mr. Sheffield incorporates by reference all of the foregoing allegations.

128. Mr. Sheffield is a person suffering legal wrong because of agency action, specifically, the FTC's issuance of the Order and the specific injuries described above. Accordingly, Mr. Sheffield is "entitled to judicial review thereof." *See* 5 U.S.C. § 702.

129. The Order is final agency action because it marks the consummation of the FTC's decision-making process, is neither tentative nor

interlocutory, and is the action from which legal consequences will flow. *See* 5 U.S.C. § 704.

130.    The Order should be held unlawful and set aside because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

131.    No provision of the FTC Act, the Clayton Act, or the Administrative Procedure Act authorizes the FTC to issue an order enjoining or restricting merger conditions on its own authority. Rather, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides the sole mechanism by which the FTC may obtain an order enjoining conduct that the FTC believes may, in the future, violate "any provision of law enforced by the Federal Trade Commission," and requires the FTC to apply for such relief to a federal district court.

132.    The FTC's Order is, in substance, an order seeking to enjoin future violations of the law by Mr. Sheffield by restraining his ability to engage in an otherwise lawful activity—taking a seat on the Board of Exxon as provided for under the Merger Agreement. Because the FTC lacks the power to issue such an order, it is "not in accordance with law."

133.    The FTC's Order is also "not in accordance with law" insofar as it is premised on a sham allegation that the merger violates Section 7 of the Clayton Act and a baseless assertion that so-called interlocking directorates are prohibited by Section 5 of the FTC Act. Nothing in Section 5 of that act includes such a prohibition;

rather, competitive issues arising from interlocking directorates are governed by Section 8 of the Clayton Act, which the FTC did not find would be violated here.

134.    The Order is also arbitrary and capricious insofar as it was issued without any factual basis to support the conclusion that Mr. Sheffield either had or would in the future violate the Clayton Act or the FTC Act.

135.    Because the Order is arbitrary and capricious and otherwise not in accordance with law, it is unlawful and should be vacated.

## COUNT FOUR

### Agency Action Unsupported By Substantial Evidence And/Or Unwarranted By the Facts, 5 U.S.C. § 706(2)(E)&(F)

136.    Mr. Sheffield incorporates by reference all of the foregoing allegations.

137.    Mr. Sheffield is a person suffering legal wrong because of agency action, specifically, the FTC's issuance of the Order and the specific injuries described above. Accordingly, Mr. Sheffield is "entitled to judicial review thereof." *See* 5 U.S.C. § 702.

138.    The Order is final agency action because it marks the consummation of the FTC's decision-making process, is neither tentative nor interlocutory, and is the action from which legal consequences will flow. *See* 5 U.S.C. § 704.

139. The Order should be held unlawful and set aside because it is unsupported by substantial evidence and/or unwarranted by the facts. *See* 5 U.S.C. §§ 706(2)(E) & (F).

140. As detailed above, the FTC Order was premised on allegations that Mr. Sheffield had engaged in "coordinated anticompetitive" activities, including coordination with domestic oil producers and with OPEC and OPEC+. Those allegations are wholly unsupported by any evidence.

141. Because no provision of the FTC Act or other law affords deference to the FTC's fact-finding on these issues, and the FTC did not proceed pursuant to Sections 556 or 557 of Title 5 or any other statute providing for review on the record of an agency hearing, the FTC's findings are subject to trial *de novo* by the reviewing court.

142. Whether tried *de novo* or reviewed pursuant to a "substantial evidence" standard, however, the FTC's allegations against Mr. Sheffield fail to hold up to scrutiny. As discussed above, the evidence developed by the FTC was woefully inadequate to establish that Mr. Sheffield had violated, or would imminently violate, any provision of law.

143. Because the FTC cannot adduce a record to support its factual findings against Mr. Sheffield on which the Order was made, it is unlawful and should be vacated.

## COUNT FIVE

### Agency Action In Excess of Statutory Authority

144.   Mr. Sheffield incorporates by reference all of the foregoing allegations.

145.   Insofar as the Court were to conclude that the FTC's Order is not subject to judicial review pursuant to the APA, including because Mr. Sheffield was not named as a respondent in the Order, Mr. Sheffield would still be entitled to non-statutory review of agency action that causes him a direct and personal injury. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("If a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action.").

146.   As outlined above, and as relevant here, the FTC's authority to adopt orders carrying the force of law is prescribed in the FTC Act and the Clayton Act.

147.   The Order is expressly predicated on the FTC's authority under those statutory enactments.

148.   As described above, neither the FTC Act nor the Clayton Act authorize the FTC to issue an order making substantive allegations *exclusively* about an individual and seeking to foreclose that individual's future professional opportunities without complying with the procedures prescribed thereunder.

149.    The FTC's Order is accordingly *ultra vires*, without a basis in law, and as outlined above contrary to Mr. Sheffield's rights secured under the First Amendment.

150.    To the extent that Mr. Sheffield has no adequate remedy at law, he is entitled to non-statutory review of the FTC's unlawful conduct.

151.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court may declare the rights and other legal relations of any interested party seeking such declaration.

152.    Mr. Sheffield is accordingly entitled to non-statutory review of the FTC's action in issuing the Order and to a declaratory judgment declaring the Order void.

## COUNT SIX

### Violation of Article III of the United States Constitution

153.    Mr. Sheffield incorporates by reference all of the foregoing allegations.

154.    Article III of the United States Constitution vests the judicial power of the United States in Article III courts. The constitution thus requires that "judicial power" may only be exercised by Article III judges. Settled law requires that only the "judicial power" may resolve "private rights." This concept is understood to encompass rights belonging to individuals—like life, liberty, or property. Generally, unless the substance of a claim has an unbroken historical pedigree of being decided outside traditional courts—like immigration or patents, for example—the case

presumptively must be decided by an Article III court. *See SEC v. Jarkesy*, 144 S. Ct. 2117, 2133–34 (2024); *id.* at 2147 (Gorsuch, J., concurring).

155. The FTC's Part 2 proceeding adopting the Order constituted, in substance, an adjudication of Mr. Sheffield's private rights. The resulting Order deprived Mr. Sheffield of his liberty and property interests to pursue and obtain an otherwise lawful business opportunity—one that had been secured by an otherwise enforceable private contract. The purported basis of the Order was the FTC's conclusion that Mr. Sheffield had engaged in, or would in the future engage in, conduct that it determined to be unlawful.

156. Setting aside the FTC's failure to observe even the administrative procedure safeguards to which Mr. Sheffield was entitled, it would have been unlawful for the FTC to conduct this proceeding in an administrative context at all. Because the proceeding leading to the issuance of the Order was conducted by an administrative agency, not by an Article III court, the proceeding violates Article III.

157. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court may declare the rights and other legal relations of any interested party seeking such declaration. Pursuant to the All Writs Act, 28 U.S.C. § 1651, the Court may issue a writ vacating the Order in aid of its jurisdiction.

158. Mr. Sheffield is accordingly entitled to an order vacating and/or enjoining enforcement of the Order on the basis that it purported to adjudicate his private rights and issued from a non-Article III tribunal.

# **PRAYER FOR RELIEF**

Sheffield prays for an order and judgment, collectively and in the alternative:

a. Vacating the FTC's Final Consent Order in Docket No. C-4815;

b. Declaring the Final Consent Order to be unenforceable on the basis that it was promulgated in violation of the Federal Administrative Procedure Act;

c. Declaring the Final Consent Order to be unenforceable on the basis that it was promulgated in violation of Mr. Sheffield's rights and immunities under the Constitution of the United States;

d. Granting permanent injunctive relief prohibiting Defendants and their officers and agents from enforcing the Final Consent Order;

e. Granting permanent injunctive relief prohibiting Defendants and their officers and agents from entering into any further consent orders or agreements with Exxon, or any third party, that affect the rights of Mr. Sheffield;

f. Granting permanent injunctive relief prohibiting Defendants and their officers and agents from issuing further statements or orders against Mr. Sheffield without complying with the provisions of the FTC Act and/or the Administrative Procedure Act;

g. Awarding Mr. Sheffield his reasonable costs, including attorneys' fees, incurred in bringing this action under 28 U.S.C. §2412, or other applicable law; and

h. Granting such other and further relief as this Court deems just and proper.

Dated: January 21, 2025

Respectfully Submitted,

/s/ Robert M. Manley
MCKOOL SMITH P.C.
Robert M. Manley (State Bar No. 00787955)
Tyler Freeman (State Bar No. 24131316)
300 Crescent Court, Suite 1200
Dallas, TX 75201
Tel. (214) 978-4000
Fax (214) 978-4044
rmanley@mckoolsmith.com
tfreeman@mckoolsmith.com

Joshua Jones (State Bar No. 24129700)
600 Travis Street, Suite 7000
Houston, TX 77002
Tel. (713) 485-7300
Fax (713) 485-7344
jjones@mckoolsmith.com

THE LAW OFFICE OF JASON NASH, P.L.L.C.
Jason Nash (State Bar No. 24032894)
601 Jameson St.
Weatherford, TX 76086
Tel. (817) 757-7062
jnash@jasonnashlaw.com

CLEARY GOTTLIEB STEEN & HAMILTON LLP
David I. Gelfand (*pro hac vice* forthcoming)
Jeremy J. Calsyn (*pro hac vice* forthcoming)
Nowell D. Bamberger (*pro hac vice* forthcoming)
Joseph M. Kay (*pro hac vice* forthcoming)
2112 Pennsylvania Avenue NW
Washington, DC 20037
Tel. (202) 974-1500
Fax (202) 974-1999
dgelfand@cgsh.com
jcalsyn@cgsh.com
nbamberger@cgsh.com
jkay@cgsh.com

*Attorneys for Scott Sheffield*

-54-